1

2

3

4

5

6

7

8                       UNITED STATES DISTRICT COURT

9                      NORTHERN DISTRICT OF CALIFORNIA

10                            San Francisco Division

11

12    JONATHAN WANG, et al.,                   Case No.  17-cv-00898-LB

13              Plaintiffs,

14          v.                                 **ORDER PARTLY GRANTING
                                               MOTION TO DISMISS**
15    GOLF TAILOR, LLC, et al.,
                                               Re: ECF No. 21
16              Defendants.

17                                    **INTRODUCTION**

18          This case and the two cases consolidated with it generally involve competing claims of design-

19    patent theft. The plaintiffs and defendants both claim to have designed the golf club and golf

20    training aid in question; both claim that the other stole their designs. In this case, the plaintiffs

21    seek relief under U.S. copyright statutes (17 U.S.C. § 101 *et seq.*), among other laws.[1] The court

22    thus has subject-matter jurisdiction of this case under 28 U.S.C. § 1331. The parties have

23    consented to magistrate jurisdiction.[2] The plaintiffs have moved under Rule 12(b)(6) to dismiss the

24

25

26
      _____

27    [1] *E.g.,* Compl. – ECF No. 1 at 15–16. Record citations refer to material in the Electronic Case File
      ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

28    [2] ECF Nos. 8, 20.

      ORDER – No. 17-cv-00898-LB

defendants' counterclaims and to strike five of their of their affirmative defenses.[3] The court held a hearing on this motion on June 29, 2017. The court grants the plaintiffs' motion.[4]

## GOVERNING LAW

A Rule 12(b)(6) motion to dismiss for failure to state a claim tests the legal sufficiency of a complaint. *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir. 2001). A claim will normally survive a motion to dismiss if it offers a "short and plain statement . . . showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a)(2). This statement "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a mere possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.''" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

The pleading standards of *Iqbal* and *Twombly* apply as well to counterclaims and affirmative defenses. *See Barnes v. AT&T Pension Ben. Plan-Nonbargained Program,* 718 F. Supp. 2d 1167, 1170–71 (N.D. Cal. 2010). "The key to determining the sufficiency of pleading an affirmative defense is whether it gives plaintiff fair notice of the defense." *Id.* at 1171 (quoting *Wyshak v. City Nat'l Bank*, 607 F.2d 824, 827 (9th Cir. 1979)). Affirmative defenses that do not meet these standards may be struck under Rule 12(f). *See id.* at 1170–71; *see also MIC Prop. and Cas. Corp. v. Kennolyn Camps, Inc.*, No. 5:15-cv-00589-EJD, 2015 WL 4624119, at *2 (N.D. Cal. Aug. 3, 2015) ("In this district at least, a defendant provides 'fair notice" of an affirmative defense by

---

[3] ECF No. 21.

[4] The court has considered both parties' additional briefing. (*See* ECF Nos. 31, 35.)

1   meeting the pleading standard articulated in Federal Rule of Civil Procedure 8, as further refined

2   by" *Twombly* and *Iqbal*.).

3       When considering a Rule 12(b)(6) motion, the court must accept as true all factual allegations

4   in the complaint as well as all reasonable inferences that may be drawn from such

5   allegations. *LSO, Ltd. v. Stroh,* 205 F.3d 1146, 1150 n. 2 (9th Cir. 2000). Such allegations must be

6   construed in the light most favorable to the nonmoving party. *Shwarz v. United States,* 234 F.3d

7   428, 435 (9th Cir. 2000). "[W]hen a written instrument contradicts allegations in the complaint to

8   which it is attached," however, "the exhibit trumps the allegations." *Gamble v. GMAC Mortg.*

9   *Corp.*, 2009 WL 400359, *3 (N.D. Cal. Feb. 18, 2009) (quoting *N. Ind. Gun & Outdoor v. City of*

10  *South Bend*, 163 F.3d 449, 454 (7th Cir. 1998)).

11

12                                      **STATEMENT**

13      This case involves the intellectual-property rights — in particular, the design rights —

14  embodied in two products. The first is a golf club and the second is a golf "training aid." The

15  plaintiffs call the club the "Wang Golf Club," which defendant Golf Tailor has manufactured and

16  sold (originally under a legitimate contract) as its own "XE1 Wedge." For present purposes,

17  following the parties' lead, the court mostly refers to the disputed club as the "XE1." The plaintiffs

18  claim that Golf Tailor sold a "CSi Wedge" as an unauthorized derivative of the XE1. The training

19  aid is called the "Speed Whip." The parties' competing claims are the same for both products. The

20  plaintiffs and the defendants claim that they designed the product and that the other party stole

21  their design, produced and sold knockoffs, and thus misappropriated their intellectual property in

22  the XE1 and Speed Whip.

23      Plaintiff Jonathan Wang designs golfing equipment, including clubs and "training aids."[5] He is

24  the founder of plaintiff GolfBestBuy, Inc.[6] Mr. Wang claims to have filed three copyright

25  applications related to the Wang Golf Club: (1) U.S. Copyright Office Case No. 1-4461451449

26

27  _____
    [5] Compl. – ECF No. 1 at 4–5 (¶¶ 17–18).

28  [6] *Id.* at 2–3 (introduction and ¶ 6).

United States District Court
Northern District of California

1    (the "'449 Drawing"); (2) No. 4461451644 (the "'644 Drawing"); and (3) No. 4459918566 (the

2    "'566 CAD Drawing"). He claims to have seven copyright applications on a line of related clubs:

3    (4) Nos. 1-4459919064, 1-4461451494, and 1-4461451569 (collectively, the "'569 Drawing");

4    and (5) Nos. 1-4461451689, 1-4461451744, and 1-4461451779 (the "'799 Drawing"). Finally, in

5    addition to these "technical drawings," Mr. Wang claims to have "created prototypes" of the Wang

6    Golf Club; photographs of these prototypes are also in dispute here.[7]

7        According to the plaintiffs: "Defendants Golf Tailor and Tim Oyler agreed to purchase golf

8    clubs and training aids embodying Mr. Wang's patented and copyrighted designs through Mr.

9    Wang's authorized distributor, Golf Gifts & Gallery ("GG&G").[8] The plaintiffs allege that Golf

10   Tailor bought the subject clubs for about a year and then started counterfeiting them.[9] Once it had

11   a source manufacturing the counterfeits, Golf Tailor stopped buying the authorized clubs from the

12   plaintiffs.[10] The plaintiffs then started selling the XE1-branded inventory that had been earmarked

13   for Golf Tailor.[11] When the plaintiffs did this, Golf Tailor sued them (in Washington federal court)

14   for unfair competition and false designation of origin.[12]

15       The defendants tell a different story. They "claim to own all intellectual[-]property rights" in

16   these products; they call the plaintiffs' claimed rights "bogus."[13] According to Golf Tailor, its CEO,

17   defendant Tim Oyler, designed the XE1 and Speed Whip. Golf Tailor alleges that it hired GG&G

18   to manufacture the XE1 and Speed Whip for sale in China. It claims that it confidentially shared

19

20   ───────────────────

21   [7] For all these allegations, see *id.* at 5–6 (¶¶ 19–20, 23) and the attendant exhibits.

     [8] ECF No. 21 at 8 (footnote omitted). GG&G is a third-party defendant in this case (*see* 1st Am.
22   Answer – ECF No. 9 at 29–38), but does not play an operative role in this analysis.

23   [9] ECF No. 21 at 8; Compl. – ECF No. 1 at 6–8.

24   [10] Compl. – ECF No. 1 at 8 (¶¶ 36–37).

     [11] *Id.* at 12–13 (¶¶ 51–52, 55–58).
25
     [12] *Id.* at 13 (¶ 60). The parties' various lawsuits over these products are outlined below.
26
     [13] This paragraph: ECF No. 26 at 5–7; 1st Am. Answer –ECF No. 19 at 15–20 (¶¶ 9, 13–43). Some
27   better specificity may be wanted at this point: While it is clear that the parties dispute both the XE1
     and the Speed Whip, the plaintiffs' affirmative claims seem to involve only the XE1 (and derivative
28   club designs); the defendants' counterclaims embrace both the XE1 and the Speed Whip. There is no
     doubt that both the plaintiffs and the defendants claim to have designed both products, and to have
     been robbed of their designs.

United States District Court
Northern District of California

its designs with GG&G to facilitate their manufacture. Then, Golf Tailor alleges, GG&G "secretly shared" these designs with another Chinese manufacturer controlled by Mr. Wang. Mr. Wang then obtained a Chinese patent on the designs; he used this to support his U.S. filings on the products. When Golf Tailor discovered that the plaintiffs were selling knockoffs of the XE1 and Speed Whip, Golf Tailor sued.

The parties have clashed over these products before. They have sued each other in federal courts in Texas and Washington. The plaintiffs here brought two design-patent suits in the Eastern District of Texas. Those cases deal respectively with the plaintiffs' patents on the Wang Golf Club and "Mr. Wang's design of a golf trainer aid."[14]  The defendants transferred both Texas cases to this district as a more convenient forum.[15] The plaintiffs consented to that transfer.[16] Meanwhile, in the Washington suit, Golf Tailor and Mr. Oyler sued the plaintiffs over the disputed products.[17] The plaintiffs have moved to dismiss that case for lack of personal jurisdiction or, alternatively, to transfer it to this district.[18] (At the June 30 hearing, the parties said that the transfer is underway.) These parallel lawsuits play only a limited role here: The plaintiffs argue that the defendants have repeatedly failed to plausibly allege that Mr. Oyler designed the XE1 and Speed Whip, so that their present counterclaims should be dismissed, not with leave to amend, but with prejudice.[19]

In this suit Golf Tailor brings 13 counterclaims. Twelve concern six images of the disputed XE1.[20] For each image, Golf Tailor asks the court to declare that the plaintiffs' claimed rights are invalid and that Golf Tailor's products did not infringe the plaintiffs' rights.[21] The crux of all these

---

[14] Compl. – ECF No. 1 at 14 (¶ 68).

[15] Id. at 15 (¶ 70); 1st Am. Answer – ECF No. 19 at 6–7 (¶ 70).

[16] Compl. – ECF No. 1 at 15 (¶ 70).

[17] Id. at 13, 15 (¶¶ 60, 71–72).

[18] Id. at 15 (¶¶ 71–72). Golf Tailor also sued the third-party defendant here, GG&G, in the Western District of Oklahoma. Golf Tailor appears to have voluntarily dismissed that case. The court mentions this only to fully describe the litigation history among the parties. As noted earlier, the third-party dispute does not figure into the present analysis.

[19] ECF No. 21 at 18–19; ECF No. 28 at 12–13).

[20] These are: (1) the '449 Drawing; (2) the '644 Drawing; (3) the "Prototype Photographs"; (4) the '566 CAD Drawing; (5) the '569 Drawing; and (6) the '779 Drawing.

[21] 1st Am. Answer – ECF No. 19 at 20–27 (¶¶ 44–97).

counterclaims is that Mr. Oyler designed the XE1.[22] Golf Tailor's last counterclaim is under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836.[23] The DTSA counterclaim involves both the XE1 and the Speed Whip.

The plaintiffs now move to dismiss the defendants' counterclaims and to strike five of their affirmative defenses.

## ANALYSIS

### 1. Counterclaim 13 — Defend Trade Secrets Act

Counterclaim 13 alleges that, by selling the XE1-branded Wang Golf Club and the Speed Whip, the plaintiffs misappropriated Golf Tailor's trade secrets, and thereby ran afoul of the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836. The DTSA "creates a cause of action for the 'owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.'" *Cave Consulting Grp., Inc. v. Truven Health Analytics Inc.*, 2017 WL 1436044, *3 (N.D. Cal. Apr. 24, 2017) (quoting 18 U.S.C. § 1836(b)(1)). "A 'trade secret' includes 'all forms and types' of information that derives value from being secret and that the owner took reasonable measures to keep secret." *Id.* (quoting 18 U.S.C. § 1839(3)(A), (B)). "'Misappropriation' consists of (a) 'acquisition of a trade secret' by a person who knows or should know the secret was improperly acquired or (b) 'disclosure or use of a trade secret of another without express or implied consent.'" *Id.* (quoting 18 U.S.C. § 1839(5)(A), (B)). The DTSA thus "contemplates three theories of liability: (1) acquisition, (2) disclosure, or (3) use" of a trade secret. *Id.* (citing 18 U.S.C. § 1839(5)).

The DTSA applies only to misappropriations that occurred "on or after the date of [DTSA's] enactment" — May 11, 2016. *Id.* (quoting Defend Trade Secrets Act of 2016, Pub. Law No. 114-

---

[22] *E.g., id.* at 20–21 (¶¶ 47, 51, 56).

[23] *Id*. at 27–28 (¶¶ 98–106).

United States District Court
Northern District of California

1   153, May 11, 2016, 130 Stat. 376); *accord, e.g., Avago Techs. U.S. Inc. v. Nanoprecision Prods.,*

2   *Inc.*, 2017 WL 412524, * 8 (N.D. Cal. Jan. 31, 2017).

3        Golf Tailor has no viable DTSA claim for the XE1. Its allegations show that, by May 11, 2016,

4   it had already lost any trade secrets that it had in this product. Golf Tailor explains that it sold the

5   XE1 in 2015 — well before DTSA's May 11, 2016 enactment. In its answer in this case, Golf

6   Tailor has "[a]dmitted that [it] had greater sales of its XE1 golf clubs in November 15 than in

7   March 2015 to November 2015."[24] Which of course shows that Golf Tailor was selling this club,

8   at the latest, by November 2015. Selling the XE1 disclosed and "extinguished" whatever design-

9   related trade secrets it embodied. There was consequently no XE1-related trade secret that could

10  be misappropriated after May 11, 2016.

11       The contours of Golf Tailor's trade secrets are set by California law. *See Ultimax Cement Mfg.*

12  *Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1355 (Fed. Cir. 2009) ("We apply the trade secret

13  law of the appropriate state, in this case, California."). Under California law: "Public disclosure,

14  that is the absence of secrecy, is fatal to the existence of a trade secret." *Id.* (quoting *In re*

15  *Providian Credit Card Cases,* 96 Cal. App. 4th 292, 304 (2002)). Indeed:

16           It is axiomatic that information widely disclosed to the public is not a trade *secret.*
             [*DVD Copy Control Ass'n v. Burner,* 116 Cal. App. 4th 241, 251 (2004)] (citing
17           *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 475 (1974) ("The subject of a
             trade secret must be secret, and must not be of public knowledge or of a general
18           knowledge in the trade [. . . .]")). By the same token, "[i]f a so-called trade secret *is*
             *fully disclosed by the products produced . . . then the right to protection is lost*."
19           *Vacco Indus., Inc. v. Van Den Berg,* 5 Cal. App. 4th 34, 50 (1992) (citing
             *Futurecraft Corp. v. Clary Corp.,* 205 Cal. App. 2d 279, 289–90 (1962)); *accord*
20           [*Providian Credit Card Cases,* 96 Cal. App. 4th at 304] ("If an individual discloses
             his trade secret to others who are under no obligation to protect the confidentiality
21           of the information, *or otherwise publicly discloses the secret*, his property right is
             extinguished") (quotations omitted).
22

23  *Action Learning Sys., Inc. v. Crowe*, 2014 WL 12564011, *5 (C.D. Cal. Aug. 11, 2014) (emphases

24  added). One form of public disclosure is selling the given product:

25           Whether viewed though the rubric of "not secret" or "not subject to reasonable
26           efforts at maintaining secrecy," it should go without saying that information,

27  _____

28  [24] *Id.* at 4 (¶ 28).

systems, or methods revealed by ***publicly-marketed products*** are not true trade
secrets. *Vacco Indus.*, 5 Cal. App. 4th at 50; [*Futurecraft*]*,* 205 Cal. App. 2d at 289–
90 (citing Restatement (First) of Torts § 757 (1939)) ("Matters which are
completely disclosed ***by the goods which one markets*** cannot be his secret[.]").

*Action Learning*, 2014 WL 12564011 at *6 (emphases added).

As *Action Learning* points out, public disclosure can be framed as the end of "reasonable
steps" to protect a product's secrecy. In this case, Golf Tailor repeatedly states that it took steps to
protect its intellectual property in the XE1 until it began selling it. For example, in its operative
pleading, Golf Tailor explains that it "took reasonable steps . . . to ensure" that the "confidential
designs" for the XE1 and Speed Whip "would  not [be] disclose[d] . . . *until the designs were
introduced into the market*."[25] Golf Tailor repeats this assertion elsewhere.[26]

Selling the XE1 and the Speed Whip in 2015 would thus disclose and "extinguish" whatever
trade secrets Golf Tailor had in these products. This is especially true for the products' ornamental,
design features, which are the focus of this lawsuit. Design features obviously would be revealed
by the products' sale. *Cf., e.g., Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc.*, 501 F.3d
1314, 1319 (Fed. Cir. 2007) ("A design patent protects the nonfunctional aspects of an ornamental
design . . . ."). Thus, Golf Tailor had no design-related trade secret in the XE1 when DTSA
became effective on May 11, 2016. There was consequently no XE1-related trade secret that the
plaintiffs could have misappropriated on or after that date. Insofar as it targets the XE1, Golf
Tailor's DTSA counterclaim therefore fails. Furthermore, given Golf Tailor's binding assertion
that it sold the products in 2015, the court does not see how amendment could save the DTSA
counterclaim. Whatever remedy Golf Tailor may have must come from another source. The XE1-
related DTSA counterclaim fails, cannot be saved by amendment, and thus is dismissed with
prejudice.[27]

---

[25] *Id.* at 17 (¶ 26) (emphasis added).

[26] *Id.* at 17–18 (¶¶ 27 ["until they are commercially released"], 28 ["confidential until they were
commercially released and disclosed to the public"], 29 ["confidential before public release"], 31
"secret until they were released"]);  Opp. – ECF No. 26 at 6 ("Golf Tailor took reasonable steps to
ensure" non-disclosure "until the designs were introduced into the market"), 10 ("until they are
commercially released").

[27] The court does not address on what terms a DTSA claim may be based on the use of a trade secret
that straddles DTSA's enactment date — that is to say, on a party's wrongfully using a trade secret

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The preceding DTSA analysis does not necessarily apply to the Speed Whip. Nothing in any allegation shows that Golf Tailor sold the Speed Whip, or otherwise publicly disclosed whatever trade secrets it embodied, before DTSA's enactment. The most that Golf Tailor's allegations say in this regard is that, "[i]n December 2015, Golf Tailor approved the final samples of the Speed Whip and placed an order with GG&G for 15,000 Speed Whip units at about this time."[28] Golf Tailor alleges that it "sold the . . . Speed Whip in interstate commerce,"[29] but it does not specify when it started doing so. Thus, it is possible that Speed Whip sales did not begin until May 11, 2016. At the hearing, however, the plaintiffs proffered the defendants' admissions about sale dates that preceded the DTSA's effective date. Golf Tailor responded ultimately that it would withdraw its DTSA counterclaim without prejudice to asserting a California trade-secrets claim. To the extent that sales of the products pre-date DTSA's enactment, the court dismisses the claim without prejudice to the defendants' raising a California trade-secrets claim.

The plaintiffs raise additional arguments against the DTSA counterclaim. These, in principle, could defeat the DTSA counterclaim, apart from the question of whether sales began before or after the law's enactment. Specifically, the plaintiffs argue that the defendants have not adequately alleged facts showing that they took reasonable steps to keep the product designs secret, that they derived economic value from keeping these designs secret, or that the plaintiffs wrongfully acquired or used the trade secrets that the products embodied.[30] The court disagrees. Apart from the date-of-enactment issue, the defendants' allegations are at least minimally sound under Rule 8(a)(2) and 12(b)(6).

---

both before and after May 11, 2016. This "continuing use" question has occupied several courts. *See, e.g., Cave Consulting*, 2017 WL 1436044 at *4–5; *Avago Technologies,* 2017 WL 412524 at *8–9; *Brand Energy & Infrastructure Servs., Inc. v. Imex Contracting Grp.*, 2017 WL 1105648, *3–4 (E.D. Pa. Mar. 24, 2017) (citing, *inter alia, Allstate Ins. Co. v. Rote*, 2016 WL 4191015, *1–5 (D. Or. Aug. 7, 2016) and *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1076–78 (N.D. Cal. 2016)).

[28] 1st Am. Answer –ECF No. 19 at 17 (¶ 24).

[29] *Id.* at 36 (¶ 47).

[30] ECF No. 21 at 10–16.

### 2. Counterclaims 1–12 — Mr. Oyler as Author of the Disputed Designs

These counterclaims all depend on defendants' central allegation that Mr. Oyler designed the XE1. More exactly, these counterclaims all charge that the plaintiffs' claimed rights in the technical drawings and "prototype photographs" identified earlier (*see, supra*, note 20) are invalid because they "fail[ed][ to name Mr. Oyler as the author" of the products depicted. For the same reason, the defendants claim that its products could not have infringed the plaintiffs' rights in those images. The plaintiffs move to dismiss all 12 of these counterclaims. They argue that the defendants have not alleged minimally sufficient facts to support their pivotal claim that Mr. Oyler created the disputed product designs.

The court agrees with the plaintiffs. In opposing the plaintiffs' motion, the defendants identify three groups of allegations that they say save their counterclaims under Rules 8(a)(2) and 12(b)(6).[31] The court finds all of them too conclusory to survive review under *Twombly* and *Iqbal*. The first two sets of allegations to which the defendants point suffer from the additional deficiency that they relate only to the Speed Whip.[32] Thus, one allegation claims that Mr. Oyler "designed various golf-training aids"; the other mentions "a new golf[-]training aid designed by Tim Oyler, called the 'Speed Whip.'"[33] Yet Counterclaims 1–12 address only the images that depict the XE1. These counterclaims do not involve the Speed Whip. (Only the DTSA counterclaim does that.) Whatever else may be said of these Speed Whip-related allegations, they do not begin to show that Mr. Oyler designed the XE1.

The third set of allegations does discuss the XE1. In particular, these allegations relate how Golf Tailor shared "Mr. Oyler's design for a new golf club called the 'XE1'" with GG&G in preparing to have the latter company manufacture the club.[34] But this does not sufficiently lay out even the most minimum facts showing that Mr. Oyler authored the design that Golf Tailor then shared with GG&G. Regarding Mr. Oyler's claimed authorship, these allegations merely invoke

---

[31] ECF No. 31 at 6–7.

[32] *See id.* at 6.

[33] *Id.*

[34] *Id.* at 6–7.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  "Mr. Oyler's design."[35] This is not enough. Particularly in the context of a product-design dispute,

2  where the central question is something like, *Who designed it?*, repeating the terse assertion that, *I*

3  *designed it,* or equivalently that, *It was X's design*, is raw conclusion, more decree than factual

4  explication. In this context, at least, the defendants' allegations of Mr. Oyler's authorship are

5  conclusory in the way that *Twombly* and *Iqbal* forbid. The court of course expresses no opinion on

6  who designed the XE1. If Mr. Oyler did design this product, though, then presumably he can

7  provide some fuller — if not exhaustively detailed — factual description of how and when he

8  reduced his ideas for this golf club to tangible form. Nor does the court understand in this vein that

9  Mr. Oyler must have done the CAD drafting himself.[36] But he must have done something to make

10 his ideas for the products concrete. *See, e.g., Gaylord v. United States,* 595 F.3d 1364, 1380 (Fed.

11 Cir. 2010) ("copyright ownership vests at the moment the work is fixed in any tangible form"). He

12 has not yet alleged how or when he did.

13     At the hearing, the plaintiffs argued that the defendants cannot assert a copyright interest in the

14 six images in question — four technical drawings, one photograph, and one CAD rendering —

15 because Mr. Wang registered the images two years before he met Mr. Oyler (and thus could not

16 have stolen them). Given the court's dismissal of the claims for failure to state a claim, the court

17 will consider this argument in the context of the defendants' amended counterclaims.

18     The plaintiffs also argue that the defendants should not be allowed to amend their

19 counterclaims. This is the first time that the defendants' allegations have come before this court,

20 however, and, on the present record, the court cannot conclude that amendment would be futile.

21 So, while the court dismisses the counterclaims, it will grant the defendants leave to amend them.

22

23

24

25

26

---

27 [35] *Id.*

28 [36] *See* ECF No. 21 at 7 ("Nothing in copyright law . . . requires that an author of a club design prepare the final CAD drawings . . . .").

United States District Court
Northern District of California

### 3. Affirmative Defenses

#### 3.1 Mr. Oyler as Author of the Disputed Designs

The plaintiffs move to strike five of the defendants' affirmative defenses. Three of these defenses — the second ("inequitable conduct"); the third (copyright invalidity); and the fifth (unclean hands) — depend on the defendants' claim that Mr. Oyler is the "true author" of the disputed product designs.[37] As just discussed, however, the defendants have not plausibly alleged that Mr. Oyler is the design's author. The court therefore grants the plaintiffs' motion to strike these affirmative defenses. The defendants may amend them.

#### 3.2 Venue

The plaintiffs also move to strike the defendants' affirmative defense that venue is improper in this district. The court grants the motion.

In the federal Texas cases between these parties, the defendants moved to transfer those cases to this district as a more convenient forum.[38] The Texas cases (as even the defendants describe them) involve the parties' competing rights in the XE1 and Speed Whip.[39] More important, the defendants concede that venue is "proper" in this district for "some claims," and that they "previously consented" to venue in this district for "some claims."[40] They nonetheless argue that venue is improper here for claims that Golf Tailor made in the Washington suit against a non-party (Kingstar) and for the plaintiffs' declaratory-judgment claims in this case "involving nonparty Kingstar."[41]

---

[37] *See* 1st Am. Answer – ECF No. 19 at 12–13.

[38] *See Wang v. Golf Tailor, LLC*, No. 6:16-cv-01163-RWS-JDL (E.D. Tex. Jan. 17, 2017) (Motion – ECF No. 19); *Wang v. Golf Tailor, LLC*, No. 6:16-cv-01233-RWS-JDL (E.D. Tex. Feb. 8, 2017) (Motion – ECF No. 14).

[39] *See* ECF No. 26 at 6–7 ("Mr. Wang used this Chinese patent [on the XE1] as the basis for one of the U.S. Patents that he asserted first in Texas, and now in this case. Golf Tailor later discovered that Mr. Wang did the same thing with Golf Tailor's Speed Whip design, which Mr. Wang also asserted in Texas and in this case.").

[40] 1st Am. Answer – ECF No. 19 at 3 (¶ 15).

[41] *Id.*; ECF No. 26 at 19.

1       The court expresses no opinion concerning Golf Tailor's claims against Kingstar in a different

2 lawsuit. With respect to the parties and the declaratory-judgment claims that are before this court,

3 however, venue is proper. Those declaratory claims are closely related to the plaintiffs' other

4 claims. The plaintiffs' claims in this suit all involve the intellectual-property rights in the XE1 and

5 Speed Whip. If the court understands matters correctly, the plaintiffs' declaratory claims simply

6 restate their more basic copyright claims in slightly different doctrinal permutation. If the

7 defendants agree that venue is "proper" here for all but the declaratory claims, then, at the least,

8 the court holds that "pendent venue" would lie over those declaratory claims. *See, e.g., Martensen*

9 *v. Koch,* 942 F. Supp. 2d 983, 998 (N.D. Cal. 2013) ("[C]ourts in this District have applied the

10 pendent venue doctrine, which holds that if venue is proper on one claim, the court may find

11 pendent venue for claims that are closely related.") (citing cases). Pendent venue would lie even if

12 Kingstar's being somehow "involv[ed]" in the declaratory claims would alone make venue over

13 those claims improper. *See id.*

14       At the June 29th hearing, moreover, Golf Tailor agreed that the venue affirmative defense is

15 moot.

16

### 3.3 Copyright Misuse

17

18       Finally, the defendants accuse the plaintiffs of "copyright misuse."[42] The court agrees with the

19 plaintiffs on this point. This affirmative defense is pleaded inadequately and the court will strike it.

20       "Copyright misuse is a judicially crafted affirmative defense to copyright infringement . . . ."

21 *Apple, Inc. v. Psystar Corp.*, 658 F.3d 1150, 1157 (9th Cir. 2011). The "purpose of the defense" is

22 to "prevent[] holders of copyrights 'from leveraging their limited monopoly to allow them control

23 of areas *outside the monopoly*.'" *Id.* (quoting *A&M Records v. Napster, Inc.,* 239 F.3d 1004, 1026

24 (9th Cir. 2001)) (emphasis added). The doctrine "does not prohibit using conditions to control use

25 of copyrighted material, but it does prevent copyright holders from using the conditions to stifle

26 competition." *Id.* at 1159. The Ninth Circuit has "applied the doctrine sparingly." *Id.* at 1157.

27

28 [42] ECF No. 19 at 13–14.

United States District Court
Northern District of California

The defendants' copyright-misuse defense does not begin to allege sufficient facts showing that the plaintiffs misused their claimed rights to "stifle competition" outside the "limited monopoly" that copyright properly grants them over the products in question. The defendants' allegations are too boilerplate to plausibly allege this defense. The defendants do not allege, they do not give "fair notice" of, how the plaintiffs are supposed to have leveraged the rights they claim to inappropriate, anticompetitive ends beyond their legitimate restrictive rights. The defendants do not even allege broadly that they are not "free to develop . . . competing" products. *See id.* at 1152.

The "only case in which [the Ninth Circuit has] upheld a copyright misuse defense" is *Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516 (9th Cir. 1997). *See Psystar*, 658 F.3d at 1157–58. The appeals court upheld the defense in *Practice Management* "because the copyright licensor in that case prevented the licensee *from using any other competing product*." *Id.* at 1157 (citing *Practice Management*, 121 F.3d at 520–21) (emphasis added). There is no remotely similar allegation here. This case is, by contrast, and at least in broad aspect, more like the decision in *Napster*. There, the Ninth Circuit "observed that the plaintiffs who sought to enjoin unlicensed use of copyrighted works were entitled to do so because they were not seeking to extend a copyright monopoly to other products or works." *Id.* (citing *Napster*, 239 F.3d at 1026).

The defendant do not adequately plead copyright misuse. The court strikes this affirmative defense.

*   *   *

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

# CONCLUSION

The court therefore:

- Dismisses the DTSA counterclaim without prejudice to the defendants' asserting a California trade-secrets claim.

- Dismisses counterclaims 1–12 with leave to amend.

- Strikes the second, third, fifth, and sixth affirmative defenses with leave to amend.

- Strikes the first affirmative defense as moot and thus without leave to amend.

The defendants may amend the appropriate counterclaims and defenses within 30 days of this order. This disposes of ECF No. 21.

**IT IS SO ORDERED.**

Dated: July 5, 2017

_____

LAUREL BEELER
United States Magistrate Judge